# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

DAVID L. WEBER,

        **Plaintiff,**

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        **Defendant.**

No. C13-1043

**RULING ON JUDICIAL REVIEW**

## TABLE OF CONTENTS

*I.*    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*    **PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*    **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      *A.*   *Weber's Education and Employment Background* . . . . . . . . . . . . 4
      *B.*   *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . . 4
          *1.*   *Weber's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . 4
          *2.*   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . 6
      *C.*   *Weber's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*IV.*    **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      *A.*   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . 10
      *B.*   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . 12
          *1.*   *Dr. Coppola's Opinions* . . . . . . . . . . . . . . . . . . . . 12
          *2.*   *Credibility Determination* . . . . . . . . . . . . . . . . . . . 16
          *3.*   *Vocational Expert Testimony and the DOT* . . . . . . . . . . . 20

*V.*    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*VI.*    **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff David L. Weber on December 24, 2013, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Weber asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Weber requests the Court to remand this matter for further proceedings.

# II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*,

---

[1] On February 21, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the Administrative Law Judge ("ALJ") meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d

1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

### A. Weber's Education and Employment Background

Weber was born in 1963. He completed the twelfth grade. While in school, he was enrolled in special education classes for math and reading. At the administrative hearing, Weber testified that he continues to have difficulties reading. He stated "I read something about three or four times before I get it right the first time."[2] In the past, Weber worked as a punch press operator.

### B. Administrative Hearing Testimony

#### 1. Weber's Testimony

At the administrative hearing, Weber's attorney asked Weber why he is unable to work. Weber stated that he can no longer work due to problems with his legs and arms. Specifically, Weber testified that his legs go numb, and he has tendinitis in his arms. Weber further stated that he has difficulty walking and standing due to his leg problems. For example, due to swelling in his legs and ankles, Weber stated that he needs to elevate his legs two hours during the day and before he goes to bed at night. Weber also indicated that he has pain associated with the swelling in his ankles and legs. Weber rated his leg pain at 9.5 to 10, on a scale of zero to ten with zero being no pain and ten being the

---

[2] Administrative Record at 45.

greatest pain. According to Weber, he treats his pain with Tylenol. Additionally, Weber testified that continuous use of his hands and wrists also causes numbness.

Weber also stated that he has a serious weight problem. He is 5 feet 7 inches tall and weighs 414 pounds. Due to his weight issues, Weber has difficulty bending, stooping, kneeling, and squatting. Another problem caused by his weight issues is shortness of breath, particularly when the weather is hot and humid. Weber testified that he can walk about 30 minutes before becoming short of breath. He stated that after 30 minutes, he needs to sit down and rest for 15 to 20 minutes. Moreover, Weber testified that in general, he can only perform any type of activity for about 30 minutes before needing to rest.

Weber's attorney also inquired about Weber's typical daily activities:

Q: How much of the daytime hours are you in [your] chair?

A: During the [daytime] hours, maybe two hours at the most.

Q: You mean that's two hours continuous?

A: Two hours continuous.

Q: How about out of the whole day, how much time?

A: About four hours, 4.5.

Q: Okay. How much during the day are you awake, would you say?

A: I usually get up in the morning, 7:00, maybe about noon.

Q: Go back to bed?

A: Go back to bed for a while, get some sleep.

Q: Okay.

A: Get up about 2:00, 2:30.

Q: Okay, than [(*sic*)] what?

A: I go outside for a while, sit down and I'll get fresh air and get my mail and stuff, and that's about all I do. . . .

Q: And are you able to do your own cooking, cleaning, or do you have help with that?

A: I do my own cooking and cleaning myself. . . .

Q: Do you have any difficulty lifting or carrying things, because you're either, your hands or just weakness in general?

A: Yes, I do.

Q: What's the most you think you can frequently lift, which would be about two-thirds of the time, what would be the most weight you think you can lift?

A: Oh, 25 pounds at the most. . . .

Q: [H]ow much weight do you think you can lift?

A: I can lift about 80 pounds, if I can take my time[.] . . .

Q: [B]ut that would be on rare occasions, right?

A: Rare occasions, yes.

Q: How about, how long can you sit without having to change positions?

A: Half an hour.

(Administrative Record at 57-60.)

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Elizabeth Albrecht with a hypothetical for an individual who is limited to:

> lifting and carrying 10 pounds occasionally, five pounds frequently; standing two hours a day; sitting six to eight hours a day. This individual would be able to change postural positions approximately every 30 minutes. That would require being able to stand from a seated position, and then stand for two to three minutes, would not necessitate leaving the work area or the work space before returning to a seated position. This hypothetical individual could only occasionally climb, balance, stoop, kneel, crouch -- this individual could not crawl. This individual would be, as far as handling goes, this individual should avoid constant . . . handling, bilaterally. This individual should have no exposure to hazardous conditions. This individual should never climb ropes, ladders, or scaffolds.

(Administrative Record at 74-75.)  The vocational expert testified that under such limitations, Weber could not perform his past relevant work. The vocational expert

6

testified, however, that Weber could perform the following unskilled sedentary jobs: (1) surveillance system monitor, (2) final assembler, and (3) call-out operator.

## C. Weber's Medical History

On October 16, 2009, Dr. Myrna Tashner, Ed.D., reviewed Weber's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment for Weber. Dr. Tashner diagnosed Weber with a learning disability. Dr. Tashner determined that Weber had the following limitations: no restriction of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Tashner concluded that:

> Current function report completed by [Weber] notes no significant limitations mentally, although when he reads instructions to a task, he has to read it more than once to comprehend it. He has no[] limits in self-care skills. He drives, cooks simple meals and cares for a pet. . . . [T]he impact of [Weber's] mental [medically determinable impairment] on the current level of functioning is non-severe.

(Administrative Record at 459.)

On February 24, 2010, Weber met with Dr. Anthony M. Coppola, D.O., for a consultative disability evaluation.[3] Weber's chief complaints were hand numbness, leg

---

[3] Interestingly, both Weber and the Commissioner incorrectly attribute this evaluation to Erica J. Krause-Wagner, FNP, Weber's treating nurse practitioner. However, the record clearly provides that Dr. Coppola performed the evaluation, and he electronically signed the evaluation document. Dr. Coppola simply noted that Krause-Wagner was Weber's primary treating nurse practitioner. The evaluation document also clearly indicates that Dr. Coppola provided a courtesy copy of the evaluation to Krause-Wagner. Furthermore, the Court notes that Krause-Wagner did not sign the evaluation document, and there is nothing in the document indicating that she conducted or participated in the evaluation. *See* Administrative Record at 464-465.

numbness and swelling, and a learning disability. Specifically, Dr. Coppola noted that Weber reported:

> As far as his hands, they go to sleep intermittently about five times per day. His left hand is worse than his right hand. It seems like the outside of his hand is affected the most. . . . He has had some cognitive delay and learning disability for quite some time.

(Administrative Record at 464.) Weber further reported to Dr. Coppola that:

> he drops things. He can only hold things in his hand for 20 minutes or so. He used to be able to lift 150 pounds. He can use the computer, but he is very slow on this. He can walk up to a block, but then his legs give out and he gets tired. He cannot knee[l], squat, or stoop because he cannot get back up. He cannot run, climb, or crawl. . . . He can sit in the car for up to a couple hours or sit at a desk for up to a couple hours at a time, but then he needs to get up and move around; otherwise, he gets numbness in his feet.

(Administrative Record at 464.) Upon examination, Dr. Coppola found that Weber had a "subjectively positive" Tinel's test at the ulnar tunnel and carpal tunnel. Phalen's test was also positive bilaterally. Dr. Coppola did not offer a diagnosis per se, but suggested that Weber probably suffered from peripheral neuropathy in his hands and legs. Dr. Coppola recommended EMG and neurological testing to better understand Weber's hand and leg numbness. Dr. Coppola also commented on the exam itself, and noted that:

> [Weber's] exam is difficult to interpret as he seems like he has pain intermittently at odd times and out of proportion to the stimulation. It is inconsistent from pressing at one point in the exam compared to other points in the exam in the same area in terms of the amount of response I get from him.

(Administrative Record at 465.) Dr. Coppola concluded that Weber "certainly has several barriers to maintaining employment with multiple health problems, morbid obesity,

cognitive delay, and several stated impairments. However, it is unclear to what extent these things have been evaluated or interventions have been put in place."[4]

On March 5, 2010, Dr. Mary Greenfield, M.D., reviewed Weber's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Weber. Dr. Greenfield determined that Weber could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Greenfield also determined that Weber could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Greenfield further limited Weber to only frequent bilateral handling. Dr. Greenfield opined that Weber should avoid concentrated exposure to hazards, such as machinery and heights. Dr. Greenfield found no visual or communicative limitations.

On March 8, 2010, Weber was referred by DDS to Dr. Carroll D. Roland, Ph.D., for a psychological evaluation. Upon examination, Dr. Roland diagnosed Weber with suspected borderline intellectual functioning. Dr. Roland concluded that:

> [Weber] has been unemployed since his previous employer of 16 years went out of business. Memory does not indicate the ability to remember 2 and 3 step instructions given by supervisory personnel. However, [Weber's] history and his response to the mental status exam suggests that he is capable of working in a repetitive work environment.

(Administrative Record at 478.)

On January 26, 2011, Dr. Laura Griffith, D.O., reviewed Weber's medical records and provided DDS with a physical RFC assessment for Weber. Dr. Griffith determined that Weber could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or

---

[4] Administrative Record at 465.

carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Weber could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Weber is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v.*

*Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Weber had not engaged in substantial gainful activity since September 15, 2008. At the second step, the ALJ concluded from the medical evidence that Weber had the following severe impairments: obesity, high blood pressure, learning disability, and obstructive sleep apnea. At the third step, the ALJ found that Weber did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Weber's RFC as follows:

> [Weber] has the residual functional capacity to perform sedentary work . . . except he can lift and carry 10 pounds occasionally and 5 pounds frequently. He can stand and walk 2 hours of an 8-hour workday. He can sit 6 hours of an 8-hour workday. He should be able to alternate between sitting and standing every 30 minutes, where he can stand for 2 or 3 minutes, not leaving the workspace before being seated. He can occasionally climb, balance, stoop, kneel, and crouch. He should avoid crawling. He should avoid constant handling bilaterally, but he can frequently handle. He should avoid exposure to hazardous conditions such as heights and moving machinery. He should never climb ropes, ladders or scaffolds.

(Administrative Record at 20.) Also at the fourth step, the ALJ determined that Weber could not perform his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Weber could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Weber was not disabled.

### B. Objections Raised By Claimant

Weber argues that the ALJ erred in three respects. First, Weber argues that the ALJ failed to properly evaluate the opinions of Dr. Coppola.[5] Second, Weber argues that the ALJ failed to properly evaluate his subjective allegations of pain and disability. Lastly, Weber argues that the ALJ failed to recognize and reconcile conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT").

### 1.  Dr. Coppola's Opinions

Weber argues that the ALJ erred by failing to address the opinions of Dr. Coppola. Specifically, Weber argues that in failing to address Dr. Coppola's opinions, the ALJ failed to consider Dr. Coppola's limitation on Weber's ability to use his hands. Weber concludes that "[t]he ALJ's error is material. The ALJ's decision should be reversed and this matter remanded to correct that error, particularly regarding . . . use of his hands."[6]

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source,

---

[5] In his brief, Weber states that the ALJ failed to properly evaluate the opinions of Erica J. Krause-Wagner, his treating nurse practitioner. However, as discussed in footnote 3, the medical record referred to in Weber's argument comes from Dr. Coppola, who electronically signed the medical document. The document does reference Krause-Wagner, but only indicates that she is Weber's primary nurse practitioner, and that she was provided with a copy of the examination record. There is no indication that Krause-Wagner performed or participated in the evaluation.

[6] Weber's Brief (docket number 12) at 12.

then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Furthermore, an ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Additionally, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*

*v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

The Court is unconvinced by Weber's argument. Contrary to Weber's assertion, the ALJ did in fact address Dr. Coppola's evaluation of Weber, but did not weigh Dr. Coppola's conclusions.[7] Generally, the failure to weigh an examining doctor's opinion would require remand. However, in this instance, Dr. Coppola's evaluation offers no opinions which need to be weighed. Significantly, Dr. Coppola's evaluation offers no opinion as to any limitations Weber may or may not have. Contrary to Weber's contention, Dr. Coppola provided no limitations on Weber's ability to use his hands. Nevertheless, in her RFC assessment for Weber, the ALJ did limit Weber's use of his hands. The ALJ determined that Weber "should avoid constant handling bilaterally, but he can frequently handle."[8]

Dr. Coppola's evaluation also offers no concrete diagnosis or diagnoses for Weber. Dr. Coppola offers suggestive diagnoses of hand and leg neuropathy, but states that laboratory and neurology work-ups are necessary to fully determine whether such suggested diagnoses are accurate.[9] Similarly, Dr. Coppola notes that Weber claims cognitive delay and learning disabilities, but states "[i]t would be nice to have more information regarding this. Specifically, if this patient had seen a neurologist or had any Neuro Psych testing that would be helpful."[10] While Dr. Coppola concludes that Weber "has several barriers to maintaining employment with multiple health problems," he also

---

[7] *See* Administrative Record at 23 (providing a review of Dr. Coppola's February 2010 physical evaluation of Weber).

[8] Administrative Record at 20.

[9] *Id.* at 465.

[10] *Id.*

14

laments that "it is unclear to what extent these [health problems] have been evaluated or interventions have been put in place."[11] Furthermore, in his evaluation of Weber, Dr. Coppola commented on the exam itself that:

> [Weber's] exam is difficult to interpret as he seems like he has pain intermittently at odd times and out of proportion to the stimulation. It is inconsistent from pressing at one point in the exam compared to other points in the exam in the same area in terms of the amount of response I get from him.

(Administrative Record at 465.)

Having reviewed the entire record, the Court finds that the ALJ properly addressed Dr. Coppola's evaluation. The Court further finds that the ALJ did not err by not weighing Dr. Coppola's evaluation. Dr. Coppola's evaluation does not contain any opinions on Weber's limitations, or diagnoses for Weber which would require an ALJ to weigh them.

Furthermore, a review of the ALJ's entire decision demonstrates that the ALJ thoroughly reviewed Weber's entire medical history and properly weighed the various medical opinions, in making her RFC determination for Weber.[12] Specifically, the Court finds that the ALJ properly considered Weber's medical records, observations of treating physicians, and Weber's own description of his limitations in making the RFC assessment for Weber.[13] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the

---

[11] *Id.* at 465.

[12] Administrative Record at 23-25 (providing a thorough review of Weber's medical history).

[13] *Id.*

ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618.

### 2. *Credibility Determination*

Weber argues that the ALJ failed to properly evaluate his subjective allegations of pain and disability. Weber maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Weber's testimony, and properly evaluated the credibility of his subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies

in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In addressing Weber's credibility, the ALJ made the following observations:

> After careful consideration of the evidence, the undersigned finds that [Weber's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Weber's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. . . .
>
> [Weber] has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

[Weber] testified at the hearing that he went through the 12th grade in high school. He took some regular classes but maintained he needed help with those and had special ed. Math had been difficult. He has to reread things. However, his high school record shows mostly B's with some A's and C's. He received mostly B's in English. He had a large number of absences also, 15 per year or more. [His] good grades despite a large number of absences, his ability to attend welding school and his successful performance of work for many years all suggest the more minimal nature of any alleged learning disability.

[Weber] talked about elevating his legs every night before going to bed and also doing so 2 hours a day which helps with swelling. If he is on his feet for long his legs swell up. He maintained if his legs and ankles swell it is painful, with pain at a level 9 1/2 to 10.

No doctor has indicated such a need as medically indicated, necessary or required. Although [Weber] alleged extreme pain, he has not persistently shared such with treating or evaluating medical individuals throughout the time in question. On one occasion when [Weber] alleged pain at a high level, he was not observed to be in acute distress. The inconsistencies undermine the undersigned's willingness to fully credit [Weber's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations.

[Weber] alleged his hands and wrists were not working well as they went numb. He had to put stuff down for a while and then go back to it. He maintained such had been happening since he worked at the punch press. However, normal/negative objective findings do not support significant limitation.

Medications have been effective to a degree in reducing and controlling symptoms when used appropriately. There are no side effects of medications credibly established which have

lasted for a 12 month continuous period despite attempts at adjustment or substitution, and which further reduce the functional capacity assigned to [Weber] by the undersigned.

When [Weber] was laid off he went to welding school. This factor, and his work and earnings history, shows a very good work ethic which is a factor in his favor concerning the credibility of his allegations. However, factors in his favor are outweighed by other evidence and inconsistencies which establish that he has retained a functional capability sufficient to perform the jobs indicated by the vocational expert at the hearing.

Based on the above discussion and inconsistencies in the record as a whole, [Weber's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility, but only such as reflected in the residual functional capacity assigned by the undersigned.

(Administrative Record at 25.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Weber's treatment history, medical history, work history, functional restrictions, medication effectiveness, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Weber's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons

explicitly discredited Weber's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *Vocational Expert Testimony and the DOT*

Weber argues that the ALJ's ultimate disability determination is flawed because the ALJ improperly relied on vocational expert testimony that was inconsistent with the DOT. At the administrative hearing, the ALJ provided the vocational expert with a hypothetical question which set forth the following limitations:

> lifting and carrying 10 pounds occasionally, five pounds frequently; standing two hours a day; sitting six to eight hours a day. This individual would be able to change postural positions approximately every 30 minutes. That would require being able to stand from a seated position, and then stand for two to three minutes, would not necessitate leaving the work area or the work space before returning to a seated position. This hypothetical individual could only occasionally climb, balance, stoop, kneel, crouch -- this individual could not crawl. This individual would be, as far as handling goes, this individual should avoid constant . . . handling, bilaterally. This individual should have no exposure to hazardous conditions. This individual should never climb ropes, ladders, or scaffolds.

(Administrative Record at 74-75.) Based on this hypothetical, the vocational expert testified that Weber could perform the following jobs: (1) surveillance system monitor, (2) final assembler, and (3) call-out operator.

Weber argues that the vocational expert's testimony is flawed because Weber's RFC, which was provided by the ALJ in his hypothetical to the vocational expert, is inconsistent with the DOT's job descriptions for surveillance system monitor, final assembler, and call-out operator. In other words, Weber asserts that the ALJ's RFC

places restrictions on him which are inconsistent with the DOT job descriptions, and preclude him from being able to perform the jobs of surveillance system monitor, final assembler, and call-out operator. Specifically, Weber argues that:

> The vocational expert's testimony is inconsistent with the Dictionary of Occupational Titles as the DOT refers to "articles like docket files" and the vocational expert testified these jobs[14] did not require frequent lifting of more than five pounds. In addition, the DOT descriptions of the jobs identified by the vocational expert simply require the claimant to sit six hours without addressing the need to alternate or to stand or the ability lift five pounds.

Weber's Brief (docket number 12) at 16.

Social Security Regulation ("SSR") 00-4p explains that in making disability determinations, the Social Security Administration relies "primarily on the DOT for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 at *2. SSR 00-4p further provides that:

> Occupational evidence provided by a VE [(vocational expert)] . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's

---

[14] In 20 C.F.R. § 404.1567, the Social Security Administration ("SSA") defines physical exertion requirements for working. The regulation also provides that the SSA's exertional requirements "have the same meaning as they have in the *Dictionary of Occupational Titles*, published by the Department of Labor. *Id*. Sedentary work is defined as work involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

> duty to fully develop the record, the adjudicator will inquire,
> on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE . . . evidence automatically
> 'trumps' when there is a conflict. The adjudicator must
> resolve the conflict by determining if the explanation given by
> the VE . . . is reasonable and provides a basis for relying on
> the VE . . . testimony rather than on the DOT information.

*Id.* While SSR 00-4p clearly provides that occupation evidence provided by a vocational expert should be consistent with occupational information contained in the DOT, the Court cautions Weber not to read too much into this Social Security regulation. In *Wheeler v. Apfel*, 224 F.3d 891 (8th Cir. 2000), the Eighth Circuit explained that:

> 'reliance on the DOT as a definitive authority on job
> requirements is misplaced, however, for DOT definitions are
> simply generic job descriptions that offer the approximate
> maximum requirements for each position, rather than their
> range.' The DOT itself cautions that its descriptions may not
> coincide in every respect with the content of jobs as performed
> in particular establishments or at certain localities. In other
> words, not all of the jobs in every category have requirements
> identical to or as rigorous as those listed in the DOT.

*Id.* at 897 (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Here, the ALJ sought testimony from a vocational expert at the administrative hearing. The vocational expert's opinion that Weber could perform the jobs of surveillance system monitor, final assembler, and call-out operator was based on the ALJ's hypothetical question which incorporated the ALJ's RFC assessment for Weber, including the ALJ's restrictions on lifting and Weber's need to alternate positions or stand periodically throughout the workday. Moreover, Weber presents no evidence that "lifting docket files" constitutes lifting more than five pounds frequently. Additionally, the need to alternate positions or stand periodically throughout the workday is contemplated by the DOT, as occasional walking and standing are incorporated into the DOT's definition of

sedentary work.[15] Because the ALJ provided the vocational expert with a proper hypothetical question, and the ALJ's RFC assessment for Weber is consistent with the DOT, the Court finds that the ALJ did not err in relying on the vocational expert's testimony. *See Gragg v. Astrue*, 615 F.3d 932. 941 (8th Cir. 2010) ("Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies."); *see also Wagner v. Astrue*, 499 F.3d 842, 854 (8th Cir. 2007) (recognizing that an ALJ may rely on the testimony of a vocational expert when making his or her findings at step four and five of the five-step sequential evaluation). In sum, the Court concludes that Weber's argument on the DOT consistency issue neither has merit, nor supports a remand of this matter for further consideration.

## V. CONCLUSION

The Court finds that the ALJ properly addressed Dr. Coppola's evaluation of Weber. The Court further finds that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. The Court also finds that the ALJ properly determined Weber's credibility with regard to his subjective complaints of pain and disability. Lastly, the Court finds no error in the hypothetical questions presented to the vocational expert by the ALJ, and no inconsistency between the Vocational Expert's testimony and the DOT. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

1.     The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.     Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

---

[15] *See* 20 C.F.R § 404.1567(a) (providing the identical definition as the DOT definition for the physical requirements for sedentary work).

3.     The Clerk of Court is directed to enter judgment accordingly.

DATED this  30th  day of October, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA